**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

EVANGELINE MARQUEZ, Personal
Representative to the Estate of
MICHAEL MATTIS, deceased,

       Plaintiff,

v.                                      Cause No. 16-CV-1259 MCA/SCY

THE GEO GROUP, INC., PHIL ARAGON,
CYNTHIA LOSE, REBECCA CHAVEZ,
ANDREW KOWALKOWSKI, JANICE RYE,
JOYCE ULIBARRI, TINA BACHICHA,
and CORIZON HEALTH, INC.

       Defendants.

**AMENDED COMPLAINT FOR THE RECOVERY OF DAMAGES CAUSED BY THE**
**DEPRIVATION OF CIVIL RIGHTS AND WRONGFUL DEATH**

      Plaintiff brings this amended complaint for damages caused by the violation of his civil

and constitutional rights. Plaintiff files this complaint under the federal Civil Rights Act, and the

Constitution of the United States. Plaintiff also brings claims under the New Mexico Tort Claims

Act and Wrongful Death Act. In support of this Complaint, Plaintiff alleges the following:

**JURISDICTION AND VENUE**

1.   Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. § 1331 and 42

     U.S.C. §§ 1983 and 1988.  Venue is proper as the acts complained of occurred exclusively

     within Guadalupe County, New Mexico.

**PARTIES**

2.   Plaintiff Evangeline Marquez, as Personal Representative to the Estate of Michael Mattis

     is an individual and resident of Valencia County, New Mexico. Mr. Mattis was an inmate

     in the custody and care of the New Mexico Department of Corrections (hereinafter

"DOC") from March 27, 2014 to October 10, 2014. While incarcerated, Mr. Mattis was completely dependent upon DOC for his care and well-being.

3. At all material times, Defendant GEO Group Inc., ("GEO") operated the Guadalupe County Correctional Facility ("GCCF") in Santa Rosa New Mexico.

4. At all material times, Defendant GEO Group, Inc. was responsible for the provision of mental health care to inmates at GCCF, with the exception of psychiatric services, which were provided by Defendant Andrew Kowalkowski.

5. Defendant GEO operated this facility pursuant to a contract with an agency of the State of New Mexico.

6. Defendant GEO is a Florida for Profit Corporation registered to do business in New Mexico.

7. During all material times Defendant Corizon Health, Inc. ("Corizon") was responsible for providing medical to inmates at GCCF pursuant to contract with an agency of the State of New Mexico.

8. Defendant Corizon is a Delaware for Profit Corporation registered to do business in New Mexico.

9. At all material times Defendants GEO and Corizon acted through their owners, officers, directors, employees, agents, or apparent agents including, but not limited to, administrators, management, nurses, doctors, technicians and other staff are responsible for their acts or omissions pursuant to the doctrines of respondeat superior, agency or apparent agency.

10. At all material times, Defendant Phil Aragon was employed by GEO.

11. At all material times, Defendant Phil Aragon was the Deputy Warden with supervisory duties at GCCF.

12. Defendant Aragon was acting under the color of state law and within the scope of his employment at all material times.

13. At all material times Defendant Rebecca Chavez was employed by Defendant GEO to provide mental health care at the GCCF.

14. At all material times Defendant Chavez was acting under color of state law and within the scope of her employment.

15. At all material times Defendant Lose was employed by Defendant GEO to provide mental health care at the GCCF.

16. At all material times Defendant Lose was acting under color of state law and within the scope of her employment.

17. At all material times Defendant Kowalkowski was contracted by Corizon to provide psychiatric services at GCCF.

18. At all material times Defendant Kowalkowski was acting under color of state law and within the scope of his employment.

19. At all material times Defendant Joyce Ulibarri was employed by Defendant Corizon.

20. At all material times Defendant Ulibarri was acting under color of state law and within the scope of her employment.

21. At all material times Defendant Janice Rye was employed by Defendant Corizon.

22. At all material times Defendant Rye was employed by Defendant Corizon.

23. At all material times Defendant Tina Bachicha was employed as a registered nurse by Defendant Corizon.

24. At all material times Defendant Tina Bachicha was acting under color of state law and within the scope of her employment.

25. Defendant Aragon is being sued in his individual and official capacities.

26. Defendant Chavez is being sued in his individual capacity only.

27. Defendant Lose is being sued in her individual capacity only.

28. Defendant Kowalkowski is being sued in his individual capacity only.

29. Defendant Joyce Ulibarri is being sued in her individual capacity only.

30. Defendant Janice Rye is being sued in her individual capacity only.

31. Defendant Tina Bachicha is being sued in her individual capacity only.

## FACTUAL BACKGROUND

32. Plaintiff Michael Mattis ("Michael") was 22 years old at the time of his death.

33. Prior to his incarceration, Michael had a history of mental health issues, including inpatient mental health treatment.

34. In January 2014, Michael was sentenced to 23 months in the New Mexico Department of Corrections.

35. Michael had never been to prison prior to this sentence.

36. On March 27, 2014, Michael was transported to the Central New Mexico Correctional Facility ("Los Lunas") for intake.

37. The intake interview conducted on his entrance to Los Lunas indicated Michael had no previous suicide attempts and that his suicide risk at the time was "low."

38. This interview also noted Michael had a history of special education.

39. As a result of Michael's intake interview and assessment by Los Lunas staff, Michael was recommended to be housed in general population.

40. About three weeks later, Michael was transferred the Springer Correctional Center (hereinafter "Springer").

41. Upon admission to Springer, Michael began exhibiting signs of severe mental illness, which was noted by staff.

42. A Mental Health Status Examination was conducted after his transfer to Springer revealing obvious signs of severe mental health issues.

43. Mental Health Status Examinations are utilized to assess the mental health of inmates, and prevent the severely mentally ill from being placed in segregation.

44. Proper administration of this examination helps ensure if isolation of severely mentally ill inmates is required, they be moved to the Alternative Placement Area ("APA") Housing.

45. APA Housing is designed specifically to meet the special mental health needs of severely mentally ill inmates held in isolation.

46. The APA is a Department of Corrections, state run facility in Santa Fe, New Mexico, and a part of the Penitentiary of New Mexico.

47. During his initial Mental Health Status Examination, Michael appeared traumatized, guarded, and bitter; responded with terse answers; his attention and concentration were impaired; and he appeared slightly confused.

48. Several days later, Springer staff noted concerning behavior. Michael explained he was afraid of "everyone," was laughing uncontrollably, and expressed he did have mental health issues, but was incapable of describing his own mental health condition.

49. A mental health counselor, Cecilia King, became so concerned with Michael's behavior she contacted his mother to discuss his situation.

50. Michael's mother indicated Michael had a history of anxiety attacks, and agreed with Ms. King that he need to be moved to a facility with more structure.

51. Ms. King also completed a mental health clearance form on which she wrote: "This inmate is not appropriate to be at SCC until he can be evaluated. Have this inmate see a psychiatrist."

52. Because of this, Michael was transferred to the Northeastern New Mexico Correctional Detention Facility in Clayton (hereinafter "Clayton") to better address his mental health needs.

53. Upon admittance to Clayton, Michael began exhibiting similar behavior to which he had in Springer.

54. Corizon employee Dorothy Rose noted that Michael laughed at inappropriate times, and diagnosed Michael likely had adjustment disorder, psychosis and anxiety.

55. On April 25, 2014 mental health staff again assessed Michael.

56. This assessment noted Michael appeared passive, guarded, had an incongruent mood, blunted affect, and his concentration, memory, and thought process were impaired.

57. Michael also exhibited inappropriate smiling, light laughter, appeared dazed and confused, and his eyes were constantly darting around.

58. Because of his obvious mental health symptoms, Michael was enrolled in the psychiatry clinic and was seen via video link on May 5, 2014 by Defendant Dr. Andrew Kowalkowski.

59. During this appointment, Defendant Kowalkowski noted that Michael was uncooperative, exhibited a "bizarre" mood, and appeared to be responding to internal stimuli.

60. As a result, Michael was diagnosed with unspecified bipolar disorder, unspecified schizophrenia, and psychotic disorder.

61. Because of his obvious mental health condition, Defendant Kowalkowski advised the facility staff to monitor Michael closely for decompensation.

62. Despite his obvious mental health issues, Defendant Kowalkowski's treatment plan not only failed to prescribe him any medications, but prescribed for him to be completely off medications.

63. On May 22, 2014, Michael was transferred to the Guadalupe County Correctional Facility in Santa Rosa (hereinafter "GCCF").

64. Upon information and belief, Michael was transferred to Santa Rosa because they were presumed to have more mental health resources available to better care for Michael.

65. Santa Rosa is privately operated by defendant GEO Group, Inc. (hereinafter "GEO").

66. On arrival to GCCF, Defendant Chavez also performed a Mental Status Examination on Michael, in which he noted no concerns to his mental condition

67. These observations were completely contrary to recent reports by medical staff at Springer and Clayton.

68. Defendant Chavez had a duty to review Michael's medical and mental health file in preparation for his evaluation of Michael.

69. Defendant Chavez ignored Michael's obvious mental health condition, which had been apparent and noted in Michael's file.

70. Shortly after he arrived to GCCF, Michael threatened to cut himself.

71. In response, Michael was placed into segregation cell A-103.

72. Cell A-103 is in the corner of the segregation cell block, behind a staircase.

73. Although there were small windows on the door of Michael's cell facing the cellblock, guards were unable to see into his cell from the control desk.

74. Defendants housed Michael in a cell where GEO staff would be unable to closely monitor him following threats of self-harm.

75. Michael remained in this cell for the duration of his time at GCCF.

76. Despite Michael's threat of self-harm, no crisis intervention was provided.

77. Michael was eventually interviewed by mental health counselor, Kristin Esquibel.

78. During this appointment, Michael's severe mental health condition was apparent.

79. Michael laughed inappropriately, appeared to be responding to internal stimuli, and asked to be moved to a Level VI facility, typically reserved for the Department of Correction's most dangerous inmates, without justification.

80. All of these noted behaviors were obvious signs of Michael's continuing deterioration.

81. Michael was moved into segregation in the Restrictive Housing Unit on "Involuntary Status" soon after this incident for being in danger of great bodily harm by himself or others.

82. Inmates placed on "Involuntary Status" are moved for disciplinary reasons, not as a result of mental illness.

83. Following his move into segregation, Defendant Chavez conducted another Mental Health Status Evaluation.

84. Again, these forms are completed to ensure severely mentally ill inmates are not held in segregation, but rather are moved to APA Housing.

85. Defendant Chavez noted Michael's mental health diagnoses, but failed to note any abnormalities in Michael's demeanor, behavior, or appearance, contrary to Ms. Esquibel's reports only days earlier.

86. Defendant Chavez was aware of Michael's severe mental illness, but created a document that would allow him to remain in GEO custody in isolation, rather than get access to necessary services.

87. Defendant Chavez had a duty to complete this evaluation accurately on all inmates, including Michael, to ensure inmates with mental illness are not held in segregation but are moved to appropriate housing, like APA Housing.

88. Defendant Lose, knowing its falsity, approved the evaluation completed by Defendant Chavez in order to allow Michael to remain in segregation in Santa Rosa.

89. As he remained isolated, Michael's mental health quickly declined and eventually caused him to act out.

90. Michael threw a food tray at a staff member and was disciplined with continued segregation and "food loaf" trays.

91. A "food loaf" is an unpalatable loaf fed to inmates as punishment.

92. Michael was being punished for symptoms of his severe mental illness.

93. As a result of his mental illness, Michael would often refuse meals and frequently only accept one meal a day, and sometimes not eat at all.

94. Michael remained isolated in his cell for much of the day during his time at GCCF.

95. During his isolation, Michael rarely received daily recreation and would often go days without leaving his cell.

96. Additionally, Michael would often go days without receiving a shower.

97. Michael's hygiene quickly declined and odor began to emanate from his cell.

98. On July 29, 2014 Michael was scheduled for his second psychiatric appointment with Defendant Kowalkowski.

99. Records indicate Michael refused to attend his appointment and it was rescheduled for two months later.

100.    Records indicate Michael did not receive any additional mental health treatment until September 2014.

101.    Over the next several weeks, Michael's behavior continued to reflect his severe mental health condition.

102.    On August 30, 2014 Michael was seen in his cell, standing on his toilet, flushing it repeatedly.

103.    Michael caused his toilet to "overflow and spew urine and feces all over the floor," according to staff reports.

104.    One guard reported that Michael had "conducted himself in this manner on several pervious occasions and was constantly on water restrictions."

105.    Michael was written up for interfering with count in response to this behavior.

106.    Despite his obvious symptoms of declining mental health, Michael received no counseling or intervention in response to this incident.

107.    On September 1, 2014 Defendant Tina Bachicha went to Michael's cell to respond to Michael's complaints of dental pain.

108.    When Defendant Bachicha arrived, Michael refused to come to the door.

109.    Instead, when Defendant Bachicha asked "do you need to see dental?" Michael responded to "Hah what".

110.     In response, Defendant Bachicha simply walked away from Michael's cell.

111.     Defendant Bachicha knew Michael had been exhibiting strange behavior and responses throughout his detention, but failed to intervene.

112.     On September 10, 2014 Michael's severe mental health condition was finally noted by staff member Cynthia Aguilar.

113.     Ms. Aguilar conducted a Mental Health Status Examination and noted Michael had poor hygiene and a smell was coming from his cell.

114.     Michael was guarded, suspicious, angry, and hostile. He continued to inappropriately laugh and was occasionally explosive, yelling profanities.

115.     Following this evaluation, Ms. Aguilar completed a Behavioral Health Evaluation, in which Michael met the positive screening criteria for APA Housing.

116.     Again, APA housing is reserved for inmates who should not be placed into Regular Level V/VI housing or disciplinary segregation.

117.     At this point, Michael was referred to APA Housing, in response to his very obvious and severe mental health condition.

118.     Following this referral, Michael did not receive any mental health intervention.

119.     Michael's next mental health appointment was set for September 29, 2014 with Defendant Kowalkowski.

120.     Again, Michael refused his telepsychiatric appointment with Defendant Kowalkowski.

121.     Despite his obvious mental health symptoms, Defendant Kowalkowski discharged Michael from the psychiatric clinic.

11

122.    At this point, Michael had only received one psychiatric appointment with Defendant Kowalkowski.

123.    Michael had been housed in segregation at GCCF for approximately four (4) months by this time.

124.    NMCD protocol prohibits inmates from being housed in Administrative or Regular segregation if they meet the criteria for APA housing.

125.    Defendant Aragon approved Michael's continued segregation despite the Michael's pending APA referral.

126.    Defendant Aragon knew Michael met APA criteria as a result of his severe mental health state.

127.    Defendant Aragon chose to ignore the fact that Michael's mental health had deteriorated to the point of being too severely compromised to remain in regular segregation

128.    Instead, Defendant Aragon approved Michael's housing.

129.    The next day, Nurse Tina Bachicha referred Michael to Mental Health.

130.    Defendant Chavez overruled this referral and stated that no further action was needed by Mental Health.

131.    Defendant Chavez again ignored the serious nature of Michael's situation and authorized 6-month continued solitary confinement.

132.    Defendant Chavez responded in this way, despite a pending APA Referral.

133.    On October 3, 2014, this referral reached Dr. Bianca McDermott, Behavioral Health Bureau Chief of the Department of Corrections who agreed that Michael needed mental health monitoring at the APA.

134.     Dr. McDermott also sent an email to Kristin Esquibel stating Michael was likely in need of a treatment guardian given his "refusal of treatment for psychosis and his consequent behavioral dysfunction."

135.     Upon information and belief, during Michael's five months at GCCF a treatment guardian was never requested, despite his refusal of treatment for psychosis.

136.     Dr. McDermott also indicated Michael should not be placed in Regular Level V/VI Housing or disciplinary segregation due to his severe mental illness.

137.     Three days later, Defendant Aragon ignored all obvious indications of Michael's serious mental health illness, and approved continued isolation of Michael in disciplinary segregation and transfer to Regular Level VI Housing.

138.     This decision by Defendant Aragon violated DOC regulations.

139.     Throughout this time, Inmate Behavior Logs indicated Michael had not been showering or using his recreation time, and had been skipping meals regularly.

140.     Despite an approved referral to APA Housing, Michael remained in Regular Level VI Housing, where his severe mental illness continued to deteriorate.

141.     By October 7, Michael's mental health had deteriorated so badly a referral was made for hospital treatment at the Mental Health Treatment Center ("MHTC")

142.     MHTC is a mental health hospital run by the New Mexico Department of Corrections.

143.     Inmates that have such severe mental health conditions that they require inpatient mental health treatment are housed at MHTC.

144.     In this referral, Kristin Esquibel indicated that Michael had been in restrictive housing (or segregation) since May 22, 2014, the day he arrived at GCCF.

145.     She also indicated that while in restrictive housing he displayed disruptive behavior, refused psychiatric appointments, and his contact with behavioral health had been minimal.

146.     Michael's referral to MHTC was approved and he was scheduled to be transferred to MHTC for inpatient treatment of his severe mental illness.

147.     Although Michael was experiencing severe mental health symptoms, he was forced to remain in segregation.

148.     Michael was on an approximate 20 minute watch at GCCF during the last days of his life.

149.     Michael was not placed on a constant watch despite a pending emergent transfer to MHTC, exhibiting known signs and symptoms of inmate depression, acute risk factors associated with suicide, and a prior suicide threat.

150.     Dr. Randolph Baca is a psychiatrist who worked at MHTC when Michael was incarcerated.

151.     Dr. Randolph Baca testified in a deposition for an inmate to be transferred to MHTC after a referral "it could take probably two days max. And during that time you would want the patient to be on observation."

152.     When paperwork is completed correctly, inmates are transported quickly, usually within 24 hours.

153.     Defendant Corizon is responsible for providing medical and psychiatric care at MHTC.

154.     It is the responsibility of Corizon employees to complete the necessary paperwork for inmate transfers to MHTC.

155.	Upon information and belief, Defendant Corizon is responsible for making sure bed space is available for incoming inmates at MHTC, including Michael Mattis.

156.	Defendant Corizon failed to complete the paperwork or clear bed space for Michael Mattis prior to his transport, scheduled for October 9, 2014.

157.	Because Corizon failed to clear space and complete Michael's paperwork, Michael's transport was cancelled on the morning of October 9, 2014.

158.	At 10:40 a.m. on October 10, 2014, GEO correctional officer Salas found Michael hanging by the neck with a strip of his bed sheets.

159.	Defendants were trained that hanging is the leading method by which inmates commit suicide.

160.	Defendants knew that after being hanged, it only takes approximately 7 minutes for oxygen to stop flowing into a person's brain.

161.	Records reflect 23 minutes had passed between the last cell check conducted by GEO staff and the time Michael was found.

162.	However, when staff members reported seeing Michael hanging he was already cold and his lips were blue.

163.	After Michael was cut down, medical staff were called to his cell.

164.	Guards radioed medical to make sure they brought a defibrillator when they came.

165.	Guards began CPR and waited for medical to arrive.

166.	Time went on and guards continued to wait for medical.

167.	One guard yelled out, "Medical should have been here! I don't know why they're taking their time!"

15

168.      Approximately ten minutes passed before Joyce Ulibarri and Janice Rye arrived at
Michael's cell.

169.      In that time, no one had called 911.

170.      Ulibarri asked GEO officers at the scene, "How long has he been down?" No one
could give her an answer.

171.      It remains unclear how long Michael was hanging before staff noticed.

172.      Despite the length of time it took for medical to arrive, staff was able to detect a
pulse.

173.      Defendants Ulibarri and Rye arrived at Michael's cell with an empty oxygen tank.

174.      Defendants Ulibarri and Rye also arrived at Michael's cell without a defibrillator.

175.      During the incident, Defendants Ulibarri and Rye asked if a defibrillator was
needed.

176.      In response, many of the guards and Defendant Ulibarri screamed "Yes!" as they
had been asking for a defibrillator since before medical even arrived.

177.      Defendant Rye re-entered Michael's cell and leaned over Defendant Ulibarri's
shoulder as she continued compressions on Michael.

178.      Defendant Rye asked a question, which visibly frustrated Defendant Ulibarri.

179.      In response, Defendant Rye whined, "I don't have one!" (a defibrillator).

180.      Defendant Ulibarri told her to go back to the office and get one.

181.      Michael was eventually moved from his cell and taken to an ambulance.

182.      Michael was pronounced dead at the local hospital at 11:12 a.m.

### COUNT I: VIOLATION OF THE EIGHTH AMMENDMENT: INHUMANE CONDITIONS OF CONFINEMENT/ INADEQUATE MEDICAL CARE
### (All Defendants)

183.     Plaintiff restates each of the preceding allegations as if fully stated herein.

184.     Plaintiff has an Eighth Amendment right to humane conditions of confinement and adequate medical care.

185.     Plaintiff's Eighth Amendment protection gave him the right to be housed in conditions that meet modern standards of decency.

186.     Rather than treat Plaintiff's mental illness, Defendants Aragon, Chavez, and Lose chose to keep Plaintiff in segregation for the entirety of his time at GCCF.

187.     Plaintiff's actions made it obvious he was in need of immediate mental health treatment.

188.     Plaintiff began making threats of self-harm upon his admission to GCCF and was not provided adequate mental healthcare in response.

189.     Instead, Plaintiff was housed in cell A-103, in the corner of the cellblock behind a staircase.

190.     Defendants could not monitor plaintiff adequately in this cell.

191.     Plaintiff quickly decompensated on his admission into solitary confinement.

192.     Plaintiff's severe condition was immediately recognized at other facilities, which transferred him out quickly due to insufficient resources to care for his mental health needs.

193.     These other facilities trusted GCCF had adequate resources to care for Michael's severe mental health symptoms

194.     Defendants Chavez and Lose ignored Plaintiff's severe and obvious mental health condition.

195.     Defendants Chavez and Lose chose to describe Plaintiff's condition as unremarkable throughout his incarceration, contrary to medical reports made by other staff members.

196.     Defendants Chavez and Lose's failure to properly report Plaintiff's mental state led to prolonged incarceration at GCCF rather than MHTC.

197.     Defendant Chavez and Defendant Lose's inaccurate reporting of Plaintiff's condition throughout his confinement prevented him from getting the necessary mental health treatment.

198.     Plaintiff's severe mental health diagnoses should have resulted in a referral to APA housing in May of 2014, subsequent to diagnoses made by Defendant Dr. Kowalkowski.

199.     Defendant Kowalkowski was aware of the severity of Plaintiff's mental health condition yet never prescribed or provided any psychotropic medications during Plaintiff's incarceration.

200.     Not only did Defendant Kowalkowski not prescribe psychotropic medications, he actively prevented Plaintiff from receiving medications.

201.     Defendant Kowalkowski failed to provide adequate mental health care to Plaintiff during his capacity as Plaintiff's psychiatrist.

202.     Defendant Kowalkowski knew that Michael had a serious mental illness.

203.     Defendant Kowalkowski deliberately ignored his patient's well-being when he failed to inquire or follow-up on this serious condition.

204.     Defendant Kowalkowski had several opportunities to intervene or inquire about Michael's worsening condition.

205.     Defendant Kowalkowski knew that refusal of psychiatric care is symptomatic of a serious mental illness.

206.     Defendant Kowalkowski did nothing in response to Michael's worsening symptoms.

207.     Defendant Aragon approved continued housing of Plaintiff in Regular Level V/VI housing despite Plaintiff's apparent mental and physical decompensation, and contrary to DOC policy.

208.     Defendant Aragon approved continued housing of Plaintiff in Regular Level V/VI housing despite reports filed and approved by mental health staff referring Plaintiff to APA placement.

209.     Defendant Aragon's approval of his continued confinement lead to further decompensation in Plaintiff's mental health.

210.     Plaintiff's prolonged placement in segregation led to a decline in his personal hygiene, and he was deemed non-compliant with facility hygiene standards.

211.     Plaintiff began exhibiting signs and symptoms associated with acute suicidal risk factors, outlined in New Mexico Department of Corrections Policy CD-180005.

212.     Specifically, Plaintiff threatened to cut himself and had "bursts of anger and periods of agitation," as described in NMDOC's policy.

213.     All Defendants were trained on the NMDOC guidelines regarding Suicide Prevention/Crisis Intervention, required by Policy CD-180005.

214.      This training informs staff that Suicide is the 9th leading cause of death in the

U.S.; more men than women die in suicide; suicide is the third leading cause of death

amount young people 15 – 24 years old in the U.S.; Most prison suicides are by hanging;

and self injury is a potential sign of future suicide.

215.      Plaintiff was a male, between the ages of 15 – 24, who had a history of self injury.

216.      Plaintiff hung himself in his cell.

217.      It is the responsibility of Defendant Aragon as deputy warden to ensure proper

inmate hygiene and obtain immediate medical care if any inmate decompensates in

solitary.

218.      Michael's referral to MHTC was made on October 7, 2014 and approved the

following day.

219.      Dr. Randolph Baca, former psychiatrist at MHTC, testified in a deposition that

there is no difficulty getting inmates transferred to MHTC.

220.      Defendant Baca testified that during the time between a referral to MHTC and an

inmate's transfer, "it could take probably two days max. And during that time you would

want the patient to be on observation."

221.      Michael's transfer was scheduled for the morning of October 9, 2014, two days

after his referral, but his transport was cancelled.

222.      Michael was found hanging in his cell approximately three days after a MHTC

referral was made, and only 24 hours after his transfer to MHTC was cancelled.

223.      Despite his obvious decline and risk for suicide, Defendants failed to place

Plaintiff on constant observation.

224.      Defendants knew that death by hanging is the most common method of suicide.

225.     Defendants knew that it only takes approximately 7-8 minutes after hanging for oxygen to stop reaching the brain.

226.     Despite Defendants' knowledge, they allowed at least 23 minutes to pass between cell checks leading up to Michael's death.

227.     As a proximate and foreseeable result of Defendants' deliberate indifference to Plaintiff's serious, obvious medical condition, Plaintiff suffered injuries including pain and suffering, emotional distress, exacerbation of his mental illness, and subsequent death.

### COUNT II: NEGLIGENT PROVISION OF MENTAL HEALTH CARE
### (Defendants Rebecca Chavez, Cynthia Lose, Andrew Kowalkowski, and The GEO Group, Inc., and Corizon)

228.     Plaintiff restates each of the preceding allegations as if fully stated herein.

229.     Defendants had a duty to provide medical care to Plaintiff during his incarceration at GCCF.

230.     Defendant Kowalkowski had a responsibility to provide Plaintiff psychiatric care during his incarceration.

231.     Defendant Kowalkowski had a duty to communicate with other mental health and correctional staff regarding Plaintiff's behavior at the prison.

232.     Defendant Kowalkowski saw Plaintiff only once during his entire incarceration, prior to his transfer to GCCF.

233.     Defendant Kowalkowski knew that Plaintiff was experiencing acute symptoms of mental illness.

234.     In response, Defendant Kowalkowski planned only for Plaintiff to be monitored without medication for decompensation.

235.     Another appointment was scheduled with Defendant Kowalkowski three months later for July 2014.

236.     Plaintiff refused to attend this appointment.

237.     Defendant Kowalkowski requested another appointment be rescheduled in two additional months.

238.     Despite his refusal of care and lack of medication, Defendant Kowalkowski failed to communicate with staff or other mental health providers regarding Plaintiff's condition.

239.     Plaintiff refused a second appointment, two months later.

240.     In response, Defendant discharged Plaintiff from the psychiatric clinic.

241.     Defendant Kowalkowski never prescribed Plaintiff any psychotropic medication in response to his mental illness.

242.     Plaintiff was experiencing a mental health crisis during his incarceration, which went ignored by Defendants for months leading up to his suicide.

243.     The standard of care requires mental health professionals must conduct mental health rounds at least once per week to assess the mental health status of all prisoners in segregation.

244.     These rounds should examine the effect of segregation of each prsoner's mental health to determine whether continued segregation is appropriate.

245.     These mental health rounds must not be a substitute for actual treatment.

246.     If a prisoner begins to show signs or symptoms of decompensation, he or she

must be immediately referred for appropriate assessment and treatment by a qualified

mental health professional.

247.     Any referral for mental health treatment must be documented and accompanied

by a a recommendation regarding appropriate housing for the inmate.

248.     This recommendation must advocate for housing that is more integraged and

therapeutic, designed to meet the needs of a seriously mentally ill inmate.

249.     If an inmate begins showing signs and symptoms of a severe mental illness, the

inmate's placement in segregation must be coordinated and overseen by an

interdisciplinary team and be guided by treatment plans.

250.     Inmates with severe mental illness must be offered face-to-face, therapeutic, out

of cell sessions with a qualified mental health professional at least once per week.

251.     Michael began showing signs and symptoms of severe mental illness prior to his

arrival at GCCF.

252.     Defendants used their mental health rounds as a substitute for Michael's treatment

and allowed him to quickly decompensate until his death.

253.     Michael was not provided weekly face-to-face, therapeutic, out of cell sessions

with a qualified mental health provider during his time at GCCF.

254.     Despite his decompensation, no recommendation was made for his transfer out of

segregation.

255.     None of the defendants advocated for more appropriate, integrated, or therapeutic

housing for Michael until September 2014.

256.     The standard of care required defendants to exercise independent medical judgment, despite security concerns or risks.

257.     Defendants allowed security to override their independent medical judgment.

258.     Defendant Chavez consistently reported Plaintiff was experiencing no signs or symptoms of any mental health issue.

259.     Defendant Chavez had a duty to review Plaintiff's file and be aware of any medical or mental health history when making decisions regarding Plaintiff's care.

260.     Defendant Chavez knew that Plaintiff was experiencing severe symptoms of a mental health crisis, but chose to ignore them.

261.     Correctional staff observed and reported Plaintiff's bizarre behavior during his incarceration making his deteriorating condition apparent.

262.     Defendant Chavez continually reported Plaintiff was capable of remaining in segregation, despite obvious signs of a mental health crisis.

263.     Defendant Chavez consistently planned for Plaintiff to remain on a 180 protocol rather than plan for any substantive care.

264.     Defendant Chavez falsified reports in order to keep Plaintiff in segregation at GCCF.

265.     Defendant Lose knowingly approved Defendant Chavez's false reports.

266.     Following Plaintiff's discharge from the psychiatric clinic by Defendant Kowalkowski, Defendant Chavez replied to a referral to mental health that no action was to be taken by mental health and Plaintiff was to remain on a 180-day protocol.

267.     Defendant Chavez changed her response to this referral 5 days later after an email from the director of behavioral health, Dr. Bianca McDermott, indicating Plaintiff was in

need of APA housing, or transfer to MHTC because of his severe mental health condition.

268.      Defendants breached their duty to Plaintiff to provide him necessary mental health care.

269.      Defendant GEO is vicariously liable for the negligent acts and ommissions of its employees, including Defendants Lose and Chavez.

270.      As a result of Defendants' negligence, Plaintiff suffered injuries including pain and suffering, emotional distress, exacerbation of his mental illness, and subsequent death.

### COUNT III: NEGLIGENT PROVISION OF MEDICAL CARE: LOST CHANCE OF SURVIVAL (Defendants Joyce Ulibarri, Janice Rye, Tina Bachicha, and Corizon)

271.      Plaintiff restates each of the preceding allegations as if fully stated herein.

272.      Corizon staff had a duty to ensure Michael received adequate care while housed at GCCF.

273.      Corizon nurses knew that Michael was suffering from severe mental illness and had been behaving bizarrely.

274.      The standard of care requires nursing staff to make rounds (and document them) at least three times per week, or more often if clinically indicated.

275.      These rounds should include questions about appetite, ability to sleep, orientation to date, time, and place, and ability to perform serial calculations.

276.      These rounds should also ask questions about the inmate's general mood, and whether or not he is having nightmares, auditory or visual hallucinations, or delusions.

277.      Corizon staff conducted segregation rounds almost every evening.

278.     Corizon staff logged that Michael had "no complaints" every day he was seen.

279.     Corizon staff made this documentation despite indication by security staff otherwise.

280.     Corizon staff failed to document Michael's declining condition, or refer him to mental health.

281.     Corizon staff provided no treatment for Michael during their rounds.

282.     Corizon staff substituted daily rounds for actual medical treatment.

283.     Only a month before his death, Defendant Tina Bachicha saw Michael in his cell exhibiting strange behavior.

284.     Instead of intervening to ensure Michael received mental healthcare, Tina Bachicha ignored Michael's symptoms and walked away.

285.     Defendant Bachicha breached her duty as she continued to ignore her patient's crisis.

286.     As a result of Defendant Bachicha's negligence, Michael's mental health continued to deteriorate until he eventually hung himself.

287.     Michael was scheduled for transport to MHTC only one day before his death.

288.     Defendant Corizon was responsible for completing necessary paperwork and clearing admission bed space for Michael's transport to the Mental Health Treatment Center.

289.     Defendant Corizon negligently failed to complete the required paperwork or arrange bed space Michael's transport.

290.     As a result, Michael was not transported to MHTC for the care he desperately needed.

291.     Michael was informed his transport had been cancelled and he would not be
transferred to the mental health hospital, MHTC.

292.     The following day, Michael was found hanging in his cell.

293.     After Michael was found in his cell, GEO staff cut him down and began giving
him compressions.

294.     GEO staff called medical and waited for their arrival to assist in the emergency
medical situation.

295.     GEO staff also asked medical to bring a defibrillator when they arrived.

296.     As they waited for Corizon staff to arrive, GEO staff quickly became frustrated.

297.     After several minutes, one GEO staff member yelled "Medical should have been
here already. I don't know why they are taking their time!"

298.     After ten minutes, Defendants Ulibarri and Rye finally arrived to Michael's cell.

299.     When  Defendants Ulibarri and Rye arrived, they did not have the appropriate
equipment to attend to an unresponsive inmate.

300.     Instead, they arrived with an empty oxygen tank.

301.     Staff also did not bring a defibrillator or gurney.

302.     After medical arrived, 911 had still not been called.

303.     Eventually, Defendant Ulibarri yelled "He has a pulse!" and asked Defendant Rye
to go get necessary equipment.

304.     At this point, medical staff still failed to obtain the equipment necessary to save
Michael's life.

305.     GEO staff eventually were able to obtain a gurney so Michael could be moved
from his cell to the ambulance.

306.     Approximately ten minutes after medical arrived at Michael's cell, and twenty
(20) minutes after he was found, Michael was placed onto a gurney and transported to the
ambulance.

307.     Michael was later declared dead at the local hospital.

308.     Following the incident, GEO staff involved in the incident met to discuss what
had just happened.

309.     During this meeting, GEO staff shared their frustration with Corizon staff during
the incident.

310.     One GEO staff member said "They [Defendant Ulibarri and Rye] weren't doing
anything! I looked at her like, 'Are you kidding me?'"

311.     Another exclaimed "I don't understand! They [Defendants Ulibarri and Rye]
didn't do anything! That's their responsibility!"

312.     Defendants Ulibarri and Rye had a duty to use the skill and care ordinarily used
by reasonably well-qualified healthcare providers.

313.     The medical standard of care requires staff to have a full oxygen tank and
working defibrillator when responding to an unresponsive patient in a prison.

314.     The medical standard of care requires staff to arrive quickly to the scene of a
hanging patient in a prison.

315.     The medical standard of care requires staff to arrive at the scene of an
unresponsive patient with a gurney to quickly transport a dying patient out of his cell.

316.     A reasonable healthcare provider would have adhered to the medical standard of
care.

317.     Defendant Corizon employs medical staff at GCCF.

28

318.     Defendant Corizon is vicariously liable for the acts and omissions of its

employees by respondeat superior.

319.     Defendant Corizon had a duty to properly and adequately train its medical staff to

respond properly to emergency situations.

320.     Suicide attempts are predictable events in a prison.

321.     Defendant Corizon had a duty to train its staff how to properly respond to

attempted suicides in a prison.

322.     Defendant Corizon had a duty to adequately arm its staff with life-saving

emergency equipment.

323.     Defendants breached their duty of care.

324.     Defendants' negligence deprived Michael of a chance of survival.

325.     Defendants' negligence was the proximate cause of this lost chance.

326.     As a result of the negligent acts and omissions by Defendants Joyce Ulibarri,

Janice Rye, Tina Bachicha, and Corizon, Plaintiff suffered physical injuries and death.

## COUNT IV: NEGLIGENCE
## (Defendant GEO Group, Inc.)

327.     Plaintiff restates each of the preceding allegations as if fully stated herein.

328.     During his detention, Michael was experiencing clear signs of mental illness.

329.     Immediately, Michael was placed into segregation at GCCF in cell A-103

330.     Cell A-103 is a cell in the GCCF administrative segregation pod, located behind a

stairwell, out of direct sight of on-duty correctional officers.

331.     Defendant GEO's staff were aware of Michael's mental health impairments, and

were responsible for observing him for decompensation.

332.     Defendant GEO's staff had a duty to ensure Michael and other inmates at the facility were safe and, most importantly, alive.

333.     Staff failed to maintain frequent observations of Michael during his time at GCCF.

334.     As a result, Michael was allowed to decompensate for five months.

335.     During the last days of his life, Michael's mental health had deteriorated to the point he was emergently being transported to MHTC.

336.     Reasonable correctional officers understand the importance of routine checks on inmates housed in segregation, especially those who are severely mentally ill.

337.     Defendant GEO's staff were also aware Michael had made threats of suicide immediately prior to entering GCCF.

338.     Correctional officers knew it only takes a short amount of time (about five minutes) for an inmate to die of hanging.

339.     Despite this, Defendant GEO's staff failed to make appropriate cell-checks of Michael.

340.     As a result, Michael hung himself in his cell and was unnoticed for a significant period of time.

341.     By the time staff noticed Michael was hanging in his cell, according to GEO staff, "his lips were blue" and "he was already cold."

342.     Defendant GEO is vicariously liable for the acts and omissions of its employees.

343.     As a result of these acts and omissions, Michael suffered injuries, including pain and suffering, emotional distress, physical injuries, and death.

WHEREFORE, Plaintiff requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

2. Punitive damages in an as yet undetermined amount severally against the individually named Defendants.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.


Respectfully submitted,

COYTE LAW P.C.

/s/ Matthew E. Coyte
Matthew E. Coyte
Attorney for Plaintiff
201 Third Street NW, Suite 1920
Albuquerque, NM 87102
(505) 244-3030

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 27th day of April, 2017, I filed the foregoing electronically through the CM/ECF system, which caused Counsel of Record to be served by electronic means.


/s/Matthew E. Coyte
Matthew E. Coyte